**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1) RICHARD MERRITTS, derivatively on behalf of SPIRIT AEROSYSTEMS HOLDINGS, INC. | **Civil Action No.**   4:20-cv-00280-GKF-FHM |
| Plaintiff, | |
| v. | |
| (1) SPIRIT AEROSYSTEMS HOLDINGS, INC.,<br>(2) ROBERT D. JOHNSON,<br>(3) CHARLES L. CHADWELL,<br>(4) IRENE M. ESTEVES,<br>(5) PAUL E. FULCHINO,<br>(6) JOSE GARCIA,<br>(7) JOHN GILSON,<br>(8) RICHARD GEPHARDT,<br>(9) RONALD T. KADISH,<br>(10) JOHN L. PLUEGER,<br>(11) LAURA H. WRIGHT and<br>(12) STEPHEN ANTHONY CAMBONE,<br>(13) THOMAS GENTILE III. | **JURY TRIAL DEMANDED** |
| Defendants, | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff ("Plaintiff"), Richard Merritts by and through his undersigned attorneys, files this Verified Shareholder Derivative Complaint ("Complaint") asserting the following allegations based upon an investigation of the relevant facts, including a review of United States Securities and Exchange Commission ("SEC") filings by Nominal Defendant Spirit AeroSystems Holdings, Inc. ("Spirit" or the "Company"), as well as reports, related litigation, press releases and other public statements issued by the Company.

**NATURE OF THE ACTION**

1.     This is a shareholder derivative action brought for the benefit of Spirit against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy Defendants' (as defined below) breaches of fiduciary duties and other misconduct from October 31, 2019 to the present (the "Relevant Period") which have caused substantial losses and other damages to the Company, as further described in detail herein.

2.     Spirit is one of the world's largest independent producers of commercial aerostructures. According to its SEC filings, the Company's main products include fuselages, pylons, nacelles and wing products and services for aircraft original equipment manufacturers ("OEM").

3.     As acknowledged by the Company, its revenues are substantially dependent on The Boeing Company ("Boeing") and it is the Company's largest and most important customer, accounting for approximately 80% of Spirit's revenues in 2018 and 2019.  The majority of these revenues are dependent on Boeing's 737 MAX plans.  For the twelve months ended December 31, 2019, approximately 53% of the Company's net revenues were generated from sales of components to Boeing for the B737 MAX aircraft.  Notably, the Company's SEC filings state that the loss of Boeing as a customer would have a material adverse effect on the Company.

4.      Following the second tragic crash of a 737 MAX plane in March 2019, the 737 MAX fleet was grounded in the U.S. and internationally following the 2018 and 2019 accidents involving two B737 MAX aircraft. On April 5, 2019, Boeing announced that it would reduce its production rate of the B737 MAX aircraft from 52 to 42 aircraft per month.

5.     Throughout the Relevant Period, market concern regarding Spirit's financial stability mounted in light of the continued grounding of the 737 MAX planes. Defendants, however, assuaged concern by stating they were "continuing to produce at a rate of 52 aircraft per

month," which would purportedly allow them to "burn off the excess inventory" after Boeing transitions to a rate of 57 737 MAX planes per month. Further, Defendants stated that they had "made good progress" on "actions on cost control and working capital to mitigate the impact," "following the MAX grounding."

6.      Additionally, during the Relevant Period, Defendants caused the Company to attest to the accuracy of Spirit's financial reporting and the effectiveness of the Company's internal controls in its filings with the SEC.

7.      On October 31, 2019, during an earnings call with analysts and investors to discuss Spirit's third quarter Defendant Thomas C. Gentile III ("Gentile"), Spirit's Chief Executive Officer ("CEO") was questioned directly by analysts regarding the impact on production rates should the 737 MAX be grounded for longer than currently expected, specifically referencing "excess inventory." Defendant Gentile stated the Company was "going to be at a rate of 52" MAX planes per month "for an extended period of time which will allow [the Company] to get more stable and allow [its] supply chain to get healthy."

8.      The assurances, however, that 737 MAX production rates were "going to be at a rate of 52" per month "for an extend period of time," were untrue. Because Boeing had continued to produce 737 MAX aircraft post-grounding, it had excess unsold planes. Therefore, Defendants knew or recklessly disregarded that this inventory buildup was reasonably likely to cause Boeing to temporarily halt 737 MAX production, which in turn, would have a significant negative impact on the Company's future financial results.

9.      Throughout the Relevant Period, Defendants made materially false and/or misleading statements by misrepresenting and failing to disclose the adverse facts pertaining to

the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.

10.     Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Boeing was sitting on numerous unsold 737 MAX airplanes, and was therefore reasonably likely to suspend production in 2020; (ii) a production halt on the 737 MAX planes would have a significant negative impact on the Company's future financial results; (iii) the Company lacked effective internal controls over financial reporting; (iv) the Company did not comply with its established accounting principles related to potential contingent liabilities; and (v) as a result, Defendants' statements and SEC filings about Spirit's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

11.     The Board had a responsibility and obligation to assure that all press releases and filings of SEC reports were truthful and not materially misleading and that proper controls and other oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are described herein but failed to do so.

12.     On December 16, 2019, Boeing announced that it was suspending all production of 737 MAX planes in 2020. Boeing stated that because it had continued production of the 737 MAX planes "[t]hroughout the grounding," that it had "approximately [737 MAX] 400 airplanes in storage," and had halted production to maintain "supply chain health." The impact of a 737 MAX production halt, which historically accounted for 50 percent of Spirit's revenues, was directly contrary to Defendants' recent positive assurances regarding 737 MAX production levels. This production halt, therefore, would have a substantial negative impact on Spirit's financial outlook

for 2020. On this news, the price of Spirit stock declined $3.10, or nearly 4 percent on the following two trading days, closing at $75.78 on December 18, 2019.

13.     On January 10, 2020, Defendants caused the Company to issue a press release announcing that due to Boeing's decision to suspend production of the 737 MAX planes, that it had terminated "approximately 2,800 employees at its Wichita, Kansas facility." The press release additionally stated that due to Spirit's excess inventory and Boeing's hundreds of planes in storage, once 737 MAX production resumed "levels [would] be lower than previously expected." On this news, the price of Spirit stock declined $3.09, or over 4 percent, to close at $69.70 on January 10, 2020.

14.     To make matters worse, on January 30, 2020, Defendants caused the Company to issue a press release announcing that Spirit had determined it did not comply with its accounting procedures regarding its potential contingent liabilities. As a result, Spirit additionally revealed that Jose Garcia ("Garcia"), Spirit's Chief Financial Officer ("CFO"), and John Gilson ("Gilson"), Spirit's Vice President of Finance and Controller, had abruptly resigned. On this news, the Company's shares fell $2.56 per share or approximately 4 percent to close at $65.08 per share on January 30, 2020.

15.     Finally, on February 28, 2020, the Company gave further insight into its previous announcement that it may have failed to account for certain potential contingent liabilities. Specifically, Spirit announced that it had identified a material weakness[1] in its internal controls

---

[1] A material weakness is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

over financial reporting, and as a result thereof, the Company "should have recorded an incremental contingent liability for the third quarter of 2019 of less than $8 million."

16.     Also, on February 28, 2020, Spirit held an earnings call with analysts and investors to discuss Spirit's 2019 financial results. On the call, Defendant Gentile revealed that 737 MAX production rates in 2020 would be over 66 percent lower than those in 2019, and would not normalize for the next several years. As a result, it was revealed by the Company's newly-appointed CFO that "2020 will be a difficult year" for Spirit. On this news, the price of Spirit stock declined $6.19 per share, or 10 percent on February 28, 2020, closing at a price of $52.84 per share.

17.     As a result of the Board's actions, the Company has already suffered, and will continue to suffer, substantial financial damage.

18.     Accordingly, this derivative action must be brought and vigorously prosecuted to protect and vindicate the rights of the Company and for restitution to the Company for, among other things, the costs and expenses that have, and will be paid, by the Company as a result of Defendants' wrongdoing.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action under 28 U.S.C. §1332(a)(2), as plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations in, this district, or is an individual

who has sufficient minimum contacts with this district so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this Court under 28 U.S.C. §1391(a) because: (1) one or more Defendants either reside in, or maintain executive offices in, this district; (2) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred within this district, and (3) Defendants have received substantial compensation in this district by conducting business herein and by engaging in numerous activities that have had an effect in this district.

## THE PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of Spirit and has continuously held Spirit stock at all relevant times.  Plaintiff is a citizen of the state of Maryland.

### Nominal Defendant

23.     Nominal Defendant Spirit is one of the world's largest independent producers of commercial aerostructures.

24.     Spirit is incorporated in Delaware and maintains substantial operations and offices in Oklahoma, making it a citizen of Oklahoma for jurisdictional purposes.

### Defendants

25.     Defendant Robert D. Johnson ("Johnson") was elected to the Company's Board in 2006 and currently serves as Chairman of the Board.  Johnson is a member of the Compensation and Corporate Governance and Nominating Committees.  Upon information and belief, Johnson is a citizen of Kansas.

26.     Defendant Charles L. Chadwell ("Chadwell") was elected to the Company's Board in 2008.  He is the Chairperson of the Corporate Governance and Nominating Committee and a member of the Compensation Committee.  Upon information and belief, Chadwell is a citizen of Florida.

27.     Defendant Irene M. Esteves ("Esteves") was elected to the Company's Board in May 2015.  Esteves serves as the Chairperson of the Audit Committee and is a member of the Risk Committee.   Upon information and belief, Esteves is a citizen of Alabama.

28.     Defendant Paul E. Fulchino ("Fulchino") was elected to the Company's Board in 2006.  Fulchino is the Chairperson of the Compensation Committee and is a member of the Corporate Governance and Nominating Committee.  Upon information and belief, Fulchino is a citizen of Florida.

29.     Defendant Gentile was appointed President and CEO of Spirit on July 31, 2016. From April 2016 to July 2016, Gentile served as the Company's Executive Vice President and Chief Operating Officer.  Upon information and belief, Gentile is a citizen of Kansas.

30.     Defendant Jose Garcia ("Garcia) served as the Company's Chief Financial Officer ("CFO") from January 9, 2019 until his abrupt resignation on January 29, 2020. Upon information and belief, Garcia is a citizen of Kansas.

31.     Defendant John Gilson ("Gilson") served as the Company's Vice President of Finance and Controller from January 8, 2018 until his abrupt resignation on January 29, 2020. Upon information and belief, Gilson is a citizen of Texas.

32.     Defendant Richard Gephardt ("Gephardt") was elected to the Company's Board in 2006.  Upon information and belief, Gephardt is a citizen of Florida.

33.     Defendant Ronald T. Kadish ("Kadish") was elected to the Company's Board in 2006.  He is the Chairperson of the Risk Committee and is a member of the Corporate Governance and Nominating Committee.  Upon information and belief, Kadish is a citizen of Virginia.

34.     Defendant John L. Plueger ("Plueger") was elected to the Company's Board in July 2014. Plueger serves as a member of the Audit and Risk Committees.  Upon information and belief, Plueger is a citizen of California.

35.     Defendant Laura H. Wright ("Wright") was elected to the Company's Board in February 20, 2018.  Wright serves as a member of the Audit and Risk Committees.  Upon information and belief, Wright is a citizen of Texas.

36.     Defendant Stephen Anthony Cambone ("Cambone") was elected to the Company's Board in October 2019.  Cambone serves as a member of the Audit and Risk Committees.  Upon information and belief, Cambone is a citizen of Texas.

37.     Collectively, Defendants Johnson, Garcia, Gilson, Chadwell, Esteves, Fulchino, Gentile, Gephardt, Kadish, Plueger, Wright and Cambone shall be referred to herein as "Defendants" or the "Individual Defendants."

## DEFENDANTS' DUTIES

### Fiduciary Duties of Defendants

38.     By reason of their positions as officers, directors, and/or fiduciaries of Spirit and because of their ability to control the business and corporate affairs of Spirit, Defendants owed Spirit and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Spirit in a fair, just, honest and equitable manner.  Defendants were and are required to act in furtherance of the best interests of

Spirit and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Spirit and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

39.     Defendants, because of their positions of control and authority as directors and/or officers of Spirit, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Spirit, each of the Defendants had knowledge of material non-public information regarding the Company and each was directly involved in the operations of the Company at the highest levels.

40.     To discharge their duties, the officers and directors of Spirit were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Spirit were required to, among other things:

    a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## SUBSTANTIVE ALLEGATIONS

41.     Spirit was formed in 2005 when Onex Corporation, a private equity investment firm, acquired the Wichita Division of Boeing, including its Tulsa and McAlester, Oklahoma facilities, in a transaction valued at $1.2 billion. Subsequently, Spirit held its initial public offering in November 2006, selling 55.1 million shares at $26.00, raising $1.43 billion.

42.     Spirit is one of the largest independent non-OEM commercial aerostructures designers and manufacturers in the world. The Company designs, engineers, and manufactures large, complex, and highly engineered commercial aerostructures such as fuselages, struts/pylons, wing structures, and flight control surfaces.

43.     Beginning in the fourth quarter of 2016, Spirit has traditionally issued a quarterly dividend on shares of its outstanding common stock. The dividend was originally $0.10 per share, but increased to $0.12 per share for the second quarter of 2018, and continued at that amount throughout 2019.

44.     Boeing is the Company's largest and most important customer, accounting for approximately 80 percent of Spirit's revenues in 2018 and 2019. The majority of these revenues are dependent on Boeing's 737 MAX airliners, which alone represent over 50 percent of Spirit's revenues. In addition, Spirit is responsible for 70 percent of the Boeing 737 MAX production, including the fuselage and wing components. As a result, continued productions of the 737 MAX planes are integral to the Company's financial survival.

45.     On March 10, 2019 a 737 MAX plane operating Ethiopian Airlines Flight 302 crashed, prompting all 737 MAX planes to be grounded globally. A 737 MAX plane had previously crashed while operating Lion Air Flight 610 on October 29, 2018.

46.     Following the grounding of the 737 MAX planes, Spirit's monthly 737 MAX production rates had been in flux, but appeared to have stabilized. At the outset of 2019, the Company had expected a production rate of 57 737 MAX planes per month. On April 5, 2019, Boeing announced that it would make a temporary adjustment in the production rate of the 737 MAX aircraft from 52 to 42 aircraft per month. Subsequent to Boeing's announcement, and pursuant to a Memorandum of Agreement executed with Boeing (the "MOA"), Spirit announced that it would maintain a 737 delivery rate of 52 shipsets per month in an effort to minimize supply chain disruptions.

**Materially False and Misleading Statements Regarding the Accuracy of Spirit's Financial Reporting and the Company Identifies a Material Weakness**

47.     On October 31, 2019, Spirit reported its financial results for the third quarter of 2019. The press release stated that the Company was "continu[ing] to produce at a rate of 52 aircraft per month in accordance with its agreement with Boeing." Defendant Gentile attributed Spirit's "solid results" as being "driven by improved operational performance and the cost mitigation actions we implemented last quarter to lessen the financial impact of remaining at a rate of 52 aircraft per month on the 737." Defendant Gentile was later quoted stating that Defendants "communicate with Boeing regularly" and "coordinate [their] production rates . . . based on the timing of the 737 MAX returning to service." Finally, Defendant Gentile was also quoted stating that he was "confident" on the "long-term outlook for the 737 MAX."

48.     That same day the Company held an earnings call with analysts and investors to discuss Spirit's third quarter financial results. During the call Defendant Gentile gave guidance and insight into the Company's visibility concerning 737 MAX production rates, stating in relevant part:

> We are continuing to produce at a rate of 52 aircraft per month as we agreed with Boeing and currently have about 65 shipsets in storage at our facilities. We

communicate with Boeing regularly and we'll coordinate our production rates with them, based on the timing of the MAX returning to service.

* * *

Our current expectations are that we will continue to produce at rate 52 in order to burn off the excess stored inventory after Boeing eventually transitions to rate 57. Given current production and storage levels, our expectation is that we will not produce at a rate higher than 52 through 2020, 2021 and possibly into 2022.

49.     In addition, Defendant Gentile stated that Spirit's cost impact initiatives in regards to the 737 MAX grounding had begun to show "the benefits of a stable production rate," stating in pertinent part:

Operationally following the MAX grounding, we've taken actions on cost control and working capital to mitigate the impact and have made good progress. We made solid progress on our cost mitigation targets this quarter and even as we made investments in improved quality and efficiency, we are starting to see some of the benefits of a stable production rate in our factories. Our focus for the remainder of the year will be to sustain progression towards optimizing our factories to deliver on our margin targets next year.

50.     Also, during the October 31, 2019 call, Garcia touted the $12 million dividend paid to shareholders that quarter, representing $0.12 per share. In his comments, Defendant Garcia attributed this to Spirit's "commitment to a disciplined and balanced approach to capital deployment," which "remain[ed] unchanged."

51.     In the question and answer portion of the October 31, 2019 call, Defendant Gentile was directly questioned as to what would happen to production rates should the 737 MAX be grounded for longer than currently expected, specifically referencing "excess inventory." In response, Defendant Gentile answered that the Company had high visibility into 737 Max production needs and supply chain, and an open and ongoing dialogue with Boeing. Defendant Gentile also stated that Spirit would remain at a production rate of 52 737 MAX planes for "an extended period of time," stating in pertinent part:

We have. We've run scenarios at all different levels of production. And it really depends on when the MAX goes back into service and how Boeing decides to manage its production schedule.

13

Obviously, we're producing at a higher rate than Boeing right now. And so we're storing those additional fuselages in a buffer and they're there anywhere from say 15 to 25 days before we ship them to Renton, which is near Seattle.

And so we've run those different scenarios. If Boeing goes down more, we would sit down and talk with them about what's the appropriate production level for us. That's why we didn't give guidance for the rest of this year. We still don't know when the MAX is going to go back into service. And we'll work closely with Boeing to determine what the right production level is.

Now, what I would say though is that this period of time where we're at 52 gives us a chance to achieve some stability that we haven't had for a while. So, going back to 2016, we were shifting from the NG to the MAX. We were hiring lots of new people. We were going up 10% a year in terms of our rate from 42 to 47 then 52 then getting ready for 57. So, as you can imagine a lot of disruption a lot of extra costs as we were going through those learning curves.

Now, we're going to be at 52 for an extended period of time which will allow us to get more stable and allow our supply chain to get healthy. And that will mean not only more stability, but also opportunities to improve quality, which is so important now in the industry -- probably more important than it's ever been.

52.     Also, on October 31, 2019, Spirit filed a Form 10-Q with the SEC, which provided its financial results and position for the fiscal quarter ended September 26, 2019 (the "3Q 2019 10- Q").

53.     The 3Q 2019 10-Q contained signed certifications by Defendants Gentile and Garcia pursuant to the Sarbanes-Oxley Act of 2002, which attested to the accuracy Spirit's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. The 3Q 2019 10-Q stated that the Company's internal controls over financial reporting were effective, stating the following:

Our President and Chief Executive Officer and Senior Vice President and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures as of September 26, 2019 and have concluded that these disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934) are effective to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time period specified in the SEC rules and forms. These disclosure controls and procedures include, without limitation, controls and procedures designed to provide reasonable assurance that information required to be disclosed by us in the reports we file or submit is accumulated and

communicated to management of the Company, including our principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

54.     The statements referenced above were materially false and/or misleading statements because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Boeing was sitting on numerous unsold 737 MAX airplanes, and was therefore reasonably likely to suspend production; (ii) a production halt on the 737 MAX planes would have a significant negative impact on the Company's future financial results; (iii) the Company lacked effective internal controls over financial reporting; (iv) the Company did not comply with its established accounting principles related to potential contingent liabilities; and (v) as a result, Defendants' statements and SEC filings about Spirit's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**<u>The Truth Begins to Emerge</u>**

55.     On December 16, 2019, Boeing announced that it was suspending all production of 737 MAX planes in 2020. Of the reasons given, Boeing stated that because it had continued production of the 737 MAX planes "[t]hroughout the grounding," that it had "approximately [737 MAX] 400 airplanes in storage," and had halted production to maintain "supply chain health." The press release stated, in pertinent part:

> Throughout the grounding of the 737 MAX, Boeing has continued to build new airplanes and there are now approximately 400 airplanes in storage. We have previously stated that we would continually evaluate our production plans should the MAX grounding continue longer than we expected. As a result of this ongoing evaluation, we have decided to prioritize the delivery of stored aircraft and temporarily suspend production on the 737 program beginning next month.

> We believe this decision is least disruptive to maintaining long-term production system and supply chain health. This decision is driven by a number of factors,

including the extension of certification into 2020, the uncertainty about the timing and conditions of return to service and global training approvals, and the importance of ensuring that we can prioritize the delivery of stored aircraft. We will continue to assess our progress towards return to service milestones and make determinations about resuming production and deliveries accordingly.

56.     The impact of a 737 MAX production halt, which historically accounted for 50 percent of Spirit's revenues, was directly contrary to Defendants' recent positive assurances regarding 737 MAX production levels. This production halt, therefore, would have a substantial negative impact on Spirit's financial outlook for 2020. On this news, the price of Spirit stock declined $3.10, or nearly 4 percent on the following two trading days, closing at $75.78 on December 18, 2019.

57.     On January 10, 2020, Spirit issued a press release announcing that due to Boeing's decision to suspend production of the 737 MAX planes, that it had terminated "approximately 2,800 employees at its Wichita, Kansas facility." The press release additionally stated that due to Spirit's excess inventory and Boeing's hundreds of planes in storage, that once 737 MAX production resumed "levels [would] be lower than previously expected." The press release stated, in pertinent part:

Spirit AeroSystems [NYSE: SPR] today issued a notice under the Worker Adjustment and Retraining Notification Act of layoffs affecting approximately 2,800 employees at its Wichita, Kansas facility. Spirit is taking this action because of the 737 MAX production suspension and ongoing uncertainty regarding the timing of when production will resume and the level of production when it does resume. This decision allows Spirit to begin aligning its cost structure to the production suspension and, after such suspension, what Spirit expects will be production levels lower than Spirit's levels in 2019.

Spirit is a significant supplier on the 737 MAX program, with its workshare accounting for 70 percent of the airplane's structure. This includes the entire fuselage, thrust reversers, engine pylons and wing components. In addition, the MAX represents more than 50 percent of Spirit's annual revenue.

Spirit has not received notice from its customer, Boeing, on how long the production suspension will last or what the production rate will be in the future. Spirit believes that, when production resumes, the levels will be lower than previously

expected due, in part, to the customer's need to consume over 100 MAX shipsets currently in storage at Spirit's facilities. In addition, Boeing has several hundred MAX airplanes built but not yet delivered to its customers.

58.    On this news, the price of Spirit stock declined $3.09, or over 4 percent, to close at $69.70 on January 10, 2020. As the market continued to digest the disappointing news, Spirit shares declined an additional $1.94 on the following trading day, closing at $67.76 on January 13, 2020. This two day trading decline totaled $5.03, or 5 percent.

59.    To make matters worse, on January 30, 2020, the Company issued a press release announcing that Spirit had determined that it did not comply with its accounting procedures for potential contingent liabilities and that Defendants Garcia and Gilson had abruptly resigned. The press release stated, in relevant part:

> Spirit AeroSystems [NYSE: SPR] today announced the appointment of Mark Suchinski as Senior Vice President and Chief Financial Officer and Damon Ward as Interim Controller and Principal Accounting Officer, effective January 29, 2020. These appointments follow the resignations of Jose Garcia, Senior Vice President and Chief Financial Officer, and John Gilson, Vice President, Controller and Principal Accounting Officer.

> "We are pleased to have Mark stepping into the CFO role," said Spirit AeroSystems President and CEO Tom Gentile. "Mark is a long-tenured and respected leader at Spirit, particularly within the finance team where he held a variety of key roles from 2006 to 2018, including serving as Controller and Principal Accounting Officer from 2014 to 2018. He brings a comprehensive understanding of our business and has strong relationships with both internal and external stakeholders. Mark is supported by Spirit's talented finance organization and is committed to our future success."

> In December 2019, Spirit received information through its established compliance processes that led Spirit to commence a review of its accounting process compliance. As a result of the review, which is ongoing, Spirit determined that it did not comply with its established accounting processes related to certain potential contingent liabilities that were received by Spirit after the end of third quarter 2019. As of today, Spirit believes this non-compliance will not result in a restatement of Spirit's financial statements for the third quarter ended September 26, 2019 or materially impact the financial statements for the fiscal year ended December 31, 2019. However, the review is ongoing and no final conclusion has been made. In light of these findings, Messrs. Garcia and Gilson tendered their resignations. Spirit has communicated about this matter with the Securities and Exchange Commission and anticipates fully cooperating with any inquiries the Commission may have.

> Spirit is taking steps to strengthen procedures relating to contingent liabilities of this type to ensure they are processed correctly in the future. Spirit expects to file

17

its Form 10-K for the 2019 fiscal year by the Securities and Exchange Commission's deadline.

60.     On this news, the Company's shares fell $2.56 per share or approximately 4 percent to close at $65.08 per share on January 30, 2020.

61.     In light of Boeing's decision to halt production on 737 MAX planes, Spirit announced on February 7, 2020, that it was declaring a dividend of $0.01, 92 percent down from the dividend of $0.12 issued in the past seven quarters. The Company stated that the cut was necessary "to preserve liquidity until production rates are at higher levels."

62.     On February 28, 2020, Defendants caused the Company to issue a press release reporting its fourth quarter and full year 2019 financial results. In the press release, Spirit stated that the "grounding of Boeing's 737 Max program was a significant issue" for the Company, "particularly after Boeing suspended production." As a result, Spirit stated that it had been forced to take substantial measures to "preserve liquidity." These measures included terminating over 3,000 employees, negotiating for an amendment to its credit facility providing for covenant relief into 2021, and securing a $375 million short-term delayed draw term loan facility. The press release also stated that "[g]iven the continued uncertainty surrounding the timing of return to service of the 737 MAX, Spirit will not be providing guidance at this time."

63.     Finally, the Company gave further insight into its previous announcement that it may have failed to account for certain potential contingent liabilities. In the earnings release, Spirit announced that it had identified a material weakness in its internal controls over financial reporting, and as a result thereof, the Company "should have recorded an incremental contingent liability for the third quarter of 2019 of less than $8 million."

64.     Also, on February 28, 2020, Spirit held an earnings call with analysts and investors to discuss Spirit's 2019 financial results. On the call Defendant Gentile revealed that 2020 737

MAX production rates would be over 66 percent lower than in 2019, and would not normalize for

the next several years, stating in pertinent part:

> On January 30, we reached an agreement with Boeing regarding production and deliveries for 2020. We will produce and deliver 216 shipsets in 2020 compared to 606 shipsets in 2019. We will restart production slowly in the coming months, ramping up deliveries through the year to deliver about 70% in the back half of 2020. We do not expect to return to 52 shipsets per month until late 2022. Of course, this agreement is based on several assumptions, including the timing of the 737 MAX return to service and Boeing's expected production rate.

65.      As a result, Defendant Gentile stated that cash flow will be "challenging . . . for the

first half of 2020," stating in pertinent part:

> Given the 737 program is our largest contributor of cash and it represents half our revenue, the production halt and slow subsequent production ramp will be challenging in terms of cash flow for the first half of 2020.

66.      Additionally on the call, Mark Suchinski, the Company's newly-appointed CFO,

stated that "2020 will be a difficult year," for Spirit, and that the Company will be forced to incur

"excess costs resulting from the 737 MAX production suspension and subsequent production re-

covery schedule," stating in pertinent part:

> Looking ahead to the 2020 financial reports, it's important to note that per GAAP, we will be recognizing excess costs resulting from the 737 MAX production suspension and subsequent production recovery schedule separate from normal production contract costs.
>
> * * *
>
> As a result, these excess costs associated with the production suspension as well as the subsequent low rate production will be reflected as period results beginning in the first quarter of 2020 and will continue until the production resources are utilized at normal capacity.
>
> * * *
>
> 2020 will be a difficult year, especially in terms of cash. And I can assure you that we will be diligently managing our liquidity and adjusting our cost structure to align to the lower levels of production. Currently, we're projecting negative overall free cash flow for 2020 with the majority of cash burn during the first half of the year.

67.     On this news, the price of Spirit stock declined $6.19 per share, or 10 percent on February 28, 2020, closing at a price of $52.84 per share.

## The Board Failed to Ensure the Company Had Adequate Internal Controls Over Financial Reporting

68.     The Charters for Spirit's Board and Audit Committee place the monitoring and establishment of adequate internal controls firmly within the purview of the Board.  Defendants caused the Company to admit that Spirit's accounting errors were caused by its inadequate and deficient control environment.  Key controls necessary to ensure that the Company's financial reporting and that the financial information provided was not misstated were not established.

69.     Here, the Board failed to establish effective internal control over its financial reporting.  Spirit's SEC filings note the importance of internal control over financial reporting stating:

> A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

70.     The Company states that it has taken remediation efforts regarding its internal control over financial reporting and its disclosure controls and procedures, including: (i) management changes, (ii) enhanced training, and , and (iii) validation regarding the application of existing policies and procedures, including direct and timely confirmation and consideration of outstanding

claims by key customers.  However, Defendants need to be held accountable to ensure these gov-
ernance changes and others are firmly implemented and consistently maintained to prevent a re-
currence of accounting errors.

### The Compensation Committee Approved Undeserved Severance Payments to Garcia and Gilson

71.     A void of leadership was created at the Company when it announced that Garcia
and Gilson abruptly resigned.  Garcia was employed with the Company just over a year.

72.     Instead of immediately terminating these executives with cause, the Board allowed
Garcia and Gilson to voluntarily resign and collect hefty severance packages and accrued benefits.

73.     On January 29, 2020, Garcia resigned.   A few days later, on January 31, 2020, the
Company and Garcia entered into a Resignation Agreement and General Release (the "Garcia
Agreement"). Under the terms of the Garcia Agreement, and in consideration of Garcia's future
cooperation, release of claims, and compliance with certain obligations, including confidentiality,
non-competition, non-solicitation, and non-disparagement covenants, Garcia will receive separa-
tion payments including the following:

- a sum of $615,000, which is equal to one year of Garcia's annual base salary applicable on the date of his resignation;
- a payment of Garcia's expected ACI award for 2019;
- a lump sum of $20,000 for COBRA coverage over a 12-month period;
- full vesting with respect to 10,861 shares underlying the Initial Sign-On RS, 5,880 shares of the One-Time RS, and 66 2/3%, or 5,344 shares, of the 2019 RS;
- a sum of $500,000 in lieu of the Subsequent Sign-On Award;
- a sum of $409,590 in lieu of receiving any portion of the annual 2020 long-term incentives;
- reimbursement of reasonable and documented career transition services through July 31, 2020; and
- continued vesting (upon the contractual vesting date) with respect to 66 2/3%, or 3,131 shares (based on target performance), of the 2019 PB-TSR and PB-FCF, subject to the Company's certification of the satisfaction of applicable performance criteria.

74.     According to the Company's SEC filings, Gilson will receive severance payments including the following:

- a sum of $295,000, which is equal to one year of  Gilson's annual base salary that was in place on Gilson's resignation date;
- a payment of Gilson's expected award for 2019 pursuant to the Short-Term Incentive Program under the 2014 Omnibus Plan, as amended, based on actual performance;
- a lump sum of $20,000 for COBRA coverage over a 12 month period;
- vesting with respect to 471 shares under a time-based restricted stock award granted to Gilson in February 2018, and vesting with respect to 481 shares under a time-based restricted stock award granted to Gilson in February 2019; and
- reimbursement of reasonable and documented career transition services through July 31, 2020.

75.     The decision to allow Garcia and Gilson to collect a hefty severance package and accrued benefits is not a protected business judgment.  These payments were undeserved and not aligned with the Company's shareholders' interests.  Furthermore, the Board's decision to allow their indemnification agreements remain in full force and effect, thereby obligating the Company to pay potentially millions of dollars to defend them in related litigation is not a protected business judgment in light of their wrongdoing.

## DERIVATIVE AND DEMAND FUTILITY
## ALLEGATIONS FOR THE BOARD OF SPIRIT

76.     Plaintiff is a current owner of Spirit shares and was an owner of Spirit shares during the Relevant Period in which the Individual Defendants' wrongful course of conduct alleged herein occurred.

77.     Plaintiff brings this action derivatively to redress injuries suffered, and to be suffered, by Spirit as a direct result of the breaches of fiduciary duty by the Individual Defendants.

78.     Defendants, who were members of Spirit's Board at the time Plaintiff filed his Complaint include: Johnson, Chadwell, Esteves, Fulchino, Gentile, Gephardt, Kadish, Plueger, Wright and Cambone. These Defendants failed to fulfill their fiduciary duties by actively

participating or acquiescing in the wrongdoing alleged herein and failed to implement adequate controls and procedures necessary to reasonably assure that the Company's financial reporting was accurate.  Such failures could not have been an exercise of good faith business judgment.

79.     Plaintiff has not made any demand upon Spirit to bring an action on behalf of the Company asserting claims herein to recover damages for the injuries suffered by Spirit, since such demand would be a futile, wasteful and useless act, and is therefore excused, for the reasons stated herein.

80.     Demand is excused because the unlawful acts and practices alleged herein cannot be defended by the Individual Defendants and are not subject to the protection of any independent business judgment since it would undoubtedly be in the Company's benefit to recover the damages caused by the Individual Defendants' wrongdoings and to assert these derivative claims.

81.     Demand is excused because the wrongs alleged herein constitute violations of fiduciary duties owed by the Individual Defendants.  The Individual Defendants are subject to liability for breaching their fiduciary duties to the Company by, among other things, causing Spirit to pursue an improper course of conduct in its business practices, as discussed above.

**The Company Admits in its SEC Filings that Defendant Gentile Lacks Independence**

82.     Defendant Gentile serves as the Company's CEO, pursuant to which he has re-ceived and continues to receive substantial monetary compensation and other benefits. Because of Gentile's employment with the Company he is not considered an independent director. Spirit has disclosed and admitted in its SEC filings that Gentile is not considered an independent direc-tor.  Thus, Defendant Gentile is incapable of impartially considering a demand to commence and vigorously prosecute this action.

**The Company Admits in its SEC Filing that Defendant Gephardt Lacks Independence**

83.      Defendant Gephardt serves as the president and CEO of the Gephardt Group, a consulting firm that provides services to the Company in connection with labor matters.  Gephardt holds a 40% equity interest in the Gephardt Group and Gephardt's son is employed with the Gephardt Group as its Chief Operating Office and also holds a 10% equity interest in the Gephardt Group.  The Company's transactions with the Gephardt Group in 2019 totaled $297,513.  Thus, Defendant Gentile is incapable of impartially considering a demand to commence and vigorously prosecute this action.

**Likelihood of Substantial Liability of the Entire Board**

84.      Demand is additionally excused because the Individual Defendants face a substantial likelihood of liability in this action as a result of their acts alleged herein.   According to the Company's SEC filings, the Company is governed by its Board and the Board is the ultimate decision-making body of the Company. The Board is responsible for overseeing the Company's strategy and performance, and protecting stockholder interests and value. Further, the Board is responsible for selecting and overseeing the Company's executive officers, who set and execute the Company's business strategy and handle the Company's day-to-day operations. The Board had a responsibility and obligation to assure that all press releases and filings of SEC reports were truthful and not materially misleading and that proper controls and other oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public but failed to do so.

85.      Here, the Company's revenues are substantially dependent on Boeing and it is the Company's largest and most important customer, accounting for approximately 80 percent of Spirit's revenues in 2018 and 2019.   The majority of these revenues are dependent on Boeing's

737 MAX airliners, which alone represent over 50 percent of Spirit's revenues. Furthermore, Spirit is responsible for 70 percent of the Boeing 737 MAX production, including the fuselage and wing components.  Notably, the Company's SEC filings stated that the loss of Boeing as a customer would have a material adverse effect on the Company.

86.    As a result, continued productions of the 737 MAX planes are integral to the Company's financial survival.  Thus, the Company's officers and directors would clearly be well aware of all developments with respect to Boeing's 737 MAX and the effect on the Company's financial reporting.   Specific details of Boeing, the Company's most important customer that ultimately determined the future viability and profitability of the entire Company would undoubtedly have been shared at the Company's Board meetings and discussed at length.  Indeed, when the information at issue pertains to a company's core business or service, as it does here, knowledge of that information may be imputed to the entire board through inference as a matter of law.  Thus, each of Spirit's Board members are charged with having knowledge that Boeing was sitting on numerous unsold 737 MAX airplanes, and was therefore reasonably likely to suspend production in 2020 and that a production halt on the 737 MAX planes would have a significant negative impact on the Company's future financial results.

87.    Furthermore, because of Defendants' advisory, executive, managerial, and directorial positions with Spirit, each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.  The Board has full and complete access to members of the Company's management.  Thus, the Board had ample opportunity to be fully informed about the Company and know the Company's true financial condition and the full extent of the Company's misrepresentations.

88.     In addition, the Individual Defendants face a substantial likelihood of personal liability and have caused Spirit to face a substantial likelihood of liability from securities class action cases filed against Spirit, which allege that the Company and its senior executives issued false and misleading statements and made material omissions.

89.     In addition, demand is also excused because the Individual Defendants engaged in or ratified the wrongdoing alleged herein as these Defendants reviewed, prepared, or had access to the materially false and misleading SEC filings described herein.  All of the pertinent information regarding Spirit's operations, business, and prospects was provided to the Individual Defendants and it was the duty of these Defendants to properly evaluate this information and provide thorough guidance and governance to the Company.  Furthermore, the Board had a responsibility and obligation to assure that all press releases and filings of SEC reports were truthful and not materially misleading and that proper controls and other oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are described herein but failed to do so.  As such, these Defendants cannot be expected to prosecute claims against themselves and/or persons or entities with whom they have extensive inter-related business and professional and personal entanglements, including the Individual Defendants, if Plaintiff demanded that they do so.  The Individual Defendants, because of these relationships (as further described below), have developed debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of Spirit.

### Likelihood of Substantial Liability of the Audit Committee Defendants

90.     The Audit Committee Defendants—Defendants Esteves, Cambone, Plueger and Wright—as members of the Audit Committee, were responsible for reviewing the Company's

financial accounting, internal controls and were directly responsible for overseeing and participating in Spirit's financial reporting process

91.     According to the Company's SEC filings, the Audit Committee members are responsible for overseeing: i) the quality and integrity of the Company's financial reporting; ii) the Company's compliance with legal and regulatory requirements; and iii) financial-related risk exposures, and related policies and processes to mitigate such risks.  The Audit Committee members are also responsible for: i) reviewing and discussing with management and the independent auditors the Company's earnings releases and quarterly and annual reports on Forms 10-Q and 10-K; and ii) considering the effectiveness of the Company's internal controls over financial reporting and participate in the resolution of any internal control issues.

92.     The Audit Committee Defendants breached their fiduciary duties by failing to perform their designated duties and responsibilities as set forth in the Audit Committee Charter by causing and allowing the Company to issue false and misleading statements; failing to identify, detect, and prevent material misstatements in the Company's SEC filings regarding the Company's internal controls; and failing to put in place or maintain proper and effective internal controls over financial reporting; and failing to comply with its established accounting principles related to potential contingent liabilities.

93.     As Audit Committee members, these directors are **held to higher standards of expertise** and are required to have, *inter alia*: i) an understanding of financial statements, including a company's balance sheet, income statement and cash flow statement, and ii) sufficient financial experience and ability to enable them to discharge their obligations as Audit Committee members. These Defendants clearly failed in their Audit Committee duties.

94.     Furthermore, the Audit Committee plays an important part in a board of director's oversight. The members of the audit committee are charged with superior knowledge, and they are presumed to be knowledgeable about the basis of the financial information a company releases to the public. SEC Release No. 33-8220 states in relevant part:

> Accurate and reliable financial reporting lies at the heart of our disclosure-based system for securities regulation, and is critical to the integrity of the U.S. securities markets. Investors need accurate and reliable financial information to make informed investment decisions. Investor confidence in the reliability of corporate financial information is fundamental to the liquidity and vibrancy of our markets.
>
> Effective oversight of the financial reporting process is fundamental to preserving the integrity of our markets. The board of directors, elected by and accountable to shareholders, is the focal point of the corporate governance system. The audit committee, composed of members of the board of directors, plays a critical role in providing oversight over and serving as a check and balance on a company's financial reporting system. The audit committee provides independent review and oversight of a company's financial reporting processes, internal controls and independent auditors. It provides a forum separate from management in which auditors and other interested parties can candidly discuss concerns. By effectively carrying out its functions and responsibilities, the audit committee helps to ensure that management properly develops and adheres to a sound system of internal controls, that procedures are in place to objectively assess management's practices and internal controls, and that the outside auditors, through their own review, objectively assess the company's financial reporting practices.

95.     Furthermore, the Audit Committee members Esteves, Wright and Plueger have each been classified by the Board as an "Audit Committee Financial Expert", as the term is defined in Item 407(d)(5) of Regulation S-K, as each possesses accounting and related financial management expertise.  In light of this, Defendants Esteves, Wright and Plueger who are classified as audit committee financial experts face an even greater likelihood of substantial liability as the manipulations and misrepresentations took place under their expert eyes.

96.     As a result of their breaches of the duties of care, good faith, and loyalty, the Audit Committee Defendants face a substantial likelihood of liability such that any demand upon them is futile.

**Likelihood of Substantial Liability of the Risk Committee Defendants**

97.     The Risk Committee Defendants- Defendants Esteves, Kadish, Cambone, Plueger and Wright- were responsible for providing oversight of management's guidelines, policies, and processes for assessing, monitoring, and mitigating the Company's critical enterprise risks, including the major strategic, operating, financial, and compliance risks inherent in the Company's business and core strategies; and overseeing management's review and assessment of key risks that have the potential to significantly affect the Company's ability to execute its strategy, and determine which risks should be included on the Board's agenda for discussion.

98.     As a result of their breaches of the duties of care, good faith, and loyalty, the Risk Committee Defendants face a substantial likelihood of liability such that any demand upon them is futile.

**Likelihood of Substantial Liability of the Compensation Committee**

99.     The Compensation Committee Defendants—Defendants Johnson, Chadwell and Fulchino—as members of the Compensation Committee, are responsible for evaluating and approving executive compensation.

100.     The Compensation Committee Defendants breached their fiduciary duties by failing to perform their designated duties and responsibilities as delineated in the Compensation Committee Charter by putting their personal interests before those of the Company—since the Individual Defendants short-term compensation, was determined at least in part, by the successful financial performance of the Company.  This elevation of their personal pecuniary interests by the Compensation Committee Defendants violated their duty of loyalty to the Company by, among other things, failing to properly allocate the impact of risk among the Company's executives and

shareholders.  As a result of their breaches of fiduciary duties, the Compensation Committee Defendants face a substantial likelihood of liability such that any demand upon them is futile.

101.    Additionally, the Compensation Committee approved generous undeserved severance payments to Garcia and Gilson as detailed herein.

### Likelihood of Substantial Liability of the Corporate Governance and Nominating Committee Members

102.    The members of the Corporate Governance and Nominating Committee members – Defendants Johnson, Chadwell, Fulchino and Kadish – were responsible in assisting the Board in its responsibilities relating to directorships and corporate governance principles.  The Nominating and Corporate Governance Committee's responsibilities include developing, recommending and/or reviewing the Company's corporate governance principles and keeping informed of developments with regard to corporate governance.

103.    These members of the Corporate Governance and Nominating Committee Members failed to meet such responsibilities. As a result of failing to oversee and implement the company's governance principles, demand upon these defendants is futile.

### The Individual Defendants Lack Independence

104.    Demand is also excused because the Individual Defendants as members of the Board, are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute a derivative action such as the instant action as a result of their participation or approval in the wrongs alleged herein, as well as the additional facts set forth below,  which taken as a whole, unequivocally show that the Individual Defendants have conflicts of interest and lack sufficient independence to exercise business judgment.

105.    The actions of the Board have impaired the Board's ability to exercise its business judgment and has rendered it incapable of reaching an independent decision regarding the acceptance of Plaintiff's demands herein.

106.    Under the factual circumstances described herein, the Individual Defendants have put their personal interests over those of the Company and as such are more concerned with protecting themselves than they are concerned with prosecuting this action.

107.    Spirit has been and will continue to be, subjected to lawsuits for the wrongdoing alleged herein, yet the Individual Defendants have not filed any lawsuits against themselves or others responsible for said wrongful conduct.  Thus, the Individual Defendants are breaching their fiduciary duties to the Company and demand upon them is futile.

108.    Plaintiff has not made any demand on shareholders of Spirit to institute this action since such demand would be a futile and useless act for the following reasons:

   a.   Spirit is a publicly traded company with thousands of shareholders of record;

   b.   Making demand on such a voluminous number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of Spirit shareholders; and

   c.   Making demand on all shareholders would force Plaintiff to incur excessive expense and obstacles, assuming all shareholders could even be individually identified with any degree of certainty.

109.    The Company has been directly and substantially injured by reason of the Individual Defendants' intentional breach and/or reckless disregard of their fiduciary duties to Spirit.  Plaintiff, as a shareholder of the Company, seeks damages and other relief on behalf of Spirit, in an amount to be proven at trial.

**COUNT I**
**CLAIM FOR BREACH OF FIDUCIARY DUTY**

110.    Plaintiff incorporates by reference all the prior paragraphs as if fully set forth

herein.

111.    The Individual Defendants have violated the fiduciary duties of care, loyalty, candor and good faith owed under Delaware law.

112.    The Individual Defendants breached their fiduciary duties of due care, good faith, candor and loyalty by, among others: failing to implement and monitor essential internal controls; causing the Company to issue statements and filings with the SEC that were false and/or misleading; causing the Company to violate basic accounting principles;  and, exposing the Company to liability for violation of federal securities laws.

113.    As a direct and proximate result, the Individual Defendants have exposed Spirit to millions of dollars in potential civil liability, as well as significant legal fees and costs, for which they are liable to the Company.  The Individual Defendants have also undermined the Company's credibility and good name, jeopardizing its core business of providing services to clients and customers.

**COUNT II**
**AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL**

114.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

115.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Spirit, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing Spirit to misrepresent material facts regarding its financial position and business prospects.

116.    As a direct and proximate result of Defendants' abuse of control, Spirit has sustained significant damages.

117.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

118.    Plaintiff, on behalf of Spirit, has no adequate remedy at law.

**COUNT III**
**AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT**

119.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

120.    Defendants had a duty to Spirit and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Spirit.

121.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Spirit in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence, and candor in the management and administration of Spirit's affairs and in the use and preservation of Spirit's assets.

122.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Spirit to engage in the allegations complained of herein which they knew had an unreasonable risk of damage to Spirit, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Spirit.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing Spirit to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and rules and to protect the Company and its shareholders from a repeat of the damaging events described herein;

C.      Awarding to Spirit restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial.


Dated: June 11, 2020                                Respectfully submitted,


                                                    _____
                                                    William B. Federman
                                                    **FEDERMAN & SHERWOOD**
                                                    10205 N. Pennsylvania Avenue
                                                    Oklahoma City, OK 73120
                                                    Telephone:  (405) 235-1560
                                                    Facsimile:  (405) 239-2112
                                                    wbf@federmanlaw.com

                                                    *Attorneys for Plaintiff*

## **VERIFICATION**

I, Richard Merritts, declare that I have reviewed the Complaint ("Complaint") and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Spirit Aerosystems Holdings, Inc., common stock during the relevant time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

__6 June 2020_____
(Date)

_____
(Signature of Investor)